**Peter FOGARTY, Plaintiff–Appellee,**

v.

**NEAR NORTH INSURANCE BROKER-AGE, INC., Defendant–Appellant.**

**Docket No. 98–7125.**

United States Court of Appeals, Second Circuit.

Argued Sept. 11, 1998.

Decided Dec. 1, 1998.

---

Barry Levenstam, Chicago, IL (Jenner & Block, Jeffrey T. Shaw, Daniel Lynch, Gary A. Hood, of Counsel), for Defendant–Appellant.

David C. Burger, New York, NY (Robinson Brog Leinwand Greene Genovese & Gluck, P.C., Michael F. Fitzgerald, of Counsel), for Plaintiff–Appellee.

Before: FEINBERG and JACOBS, Circuit Judges, and POLLACK *, District Judge.

FEINBERG, Circuit Judge:

Defendant Near North Insurance Brokerage, Inc. (Near North) appeals from a judgment of $481,028.49 against it in favor of Peter Fogarty (Fogarty) after a jury trial in the United States District Court for the Southern District of New York before Judge Leonard B. Sand. Fogarty, the former President of Near North's New York office, had claimed that Near North unlawfully withheld bonus compensation he was entitled to pursuant to his employment contract, constructively discharged him and unlawfully withheld reimbursement for reasonable business expenses. Jurisdiction was based upon diversity of citizenship. The only point Near North raises on appeal is that the district court erroneously instructed the jury that it could, as a last resort, construe the ambiguous terms of the employment contract against

* Hon. Milton Pollack, United States District Judge for the Southern District of New York, sitting by designation.

Near North, the drafter of the disputed terms of the contract. Near North claims that this instruction, which embodied the doctrine of contract construction known as *contra proferentem*, was an incorrect statement of the concededly applicable New York law. Near North further claims that the error was prejudicial because of the likelihood that the jury arrived at its verdict by applying the doctrine. Fogarty argues that (1) Near North failed to preserve the erroneous charge issue for appeal by offering no objection to the instruction when it was proposed to the district court, considered, and given in the charge; and (2) under the current state of New York law the instruction was appropriate under the circumstances.

For the reasons stated below, we agree with Fogarty that Near North failed to preserve at trial its objection to the charge. We therefore do not reach his second argument, and we affirm.

## I. Background

Near North is a full-service insurance brokerage firm based in Chicago. In 1994, Near North wanted to add a risk management practice to its New York office and, in connection with this venture, sought to hire an executive employee. Near North approached Fogarty, then a senior consultant at another firm, and inquired about his interest in the position. Fogarty stated that Near North would have to offer him $400,000 per year in order to persuade him to leave his current job, at which he had earned approximately $250,000 the year before. Tom Knaup (Knaup), a Near North employee in charge of filling the New York position, offered Fogarty a compensation package of $200,000 in salary and a $200,000 bonus. Fogarty asked that the terms of employment be put into writing.

Near North then sent Fogarty a three-year "offer of employment" in the form of an April 13, 1994 letter signed by Dan C. Borbas (Borbas), Near North's Executive Vice President for Corporate Development and Human Resources. The two-page offer stated that Fogarty would "join Near North Insurance Brokerage as President of our New York office" at a salary of $200,000 per year, and that Fogarty's annual $200,000 bonus would be based on two criteria: (1) the hiring of "necessary staff to develop and service the business being developed"; and (2) "your office" meeting the "Cumulative Revenue Production" goals specified for each of the three years of the proposed contract. After reviewing the offer, Fogarty called Knaup with two objections. First, Fogarty felt that the cumulative revenue production goals he was required to meet in order to qualify for his bonus were too high. Second, the offer appeared to make the bonus payable in a lump sum at year's end and Fogarty did not want to wait that long to receive it.

In response to these concerns, Near North sent Fogarty a "revised offer of employment" in the form of a May 13, 1994 letter signed by Borbas.[1] The revised offer lowered Fogarty's cumulative revenue production goals

---

1. The letter, in relevant part, stated:

   Dear Peter:
   This letter will serve as our revised offer of employment to you. The following specific commitments are being made to you and will become effective upon your starting date:
   You will join Near North Insurance Brokerage as President of our New York Office.
   Your salary will be $7,692.31 per payday (based on 26 pay periods, i.e., $200,000 on an annualized basis).
   You will participate in the following revenue production bonus program based on two criteria: 1) Your hiring the necessary staff to develop and service the business being developed, and 2) your office achieving the stipulated production goals outlined below:

   | Cumulative Revenue Production | Bonus * |
   | --- | --- |
   | 1st 12 month period $1,500,000 | $200,000 |
   | 2nd 12 month period $2,500,000 | $200,000 |
   | 3rd 12 month period $3,500,000 | $200,000 |

   * In the first year, the bonus payment will be paid in three installments; $50,000 will be paid as soon as practical after the agreed upon staff complement has been hired, $50,000 will be paid within 30 days of receipt of the first $750,000 in revenue production, and $100,000 will be paid upon receipt of an additional $750,000 in revenue production in this first 12 month period. Subsequent bonus payments will be made within 30 days of receipt of the total stipulated cumulative revenue produced in each of the next two 12 month periods.

   If you are terminated for any reason, other than gross misconduct, within the first 24 months of employment, you will receive six months severance pay based on your base salary at the time of termination.

for all three years, and provided that his first-year bonus was to be paid in three installments linked to his progress in meeting the contract's hiring and revenue requirements.. Fogarty accepted the revised offer, and began working for Near North in September 1994.

Fogarty remained an employee of Near North for 15 months, resigning in December 1995. He subsequently brought this lawsuit, alleging that Near North (1) breached his employment contract by unlawfully withholding $300,000 in earned bonus compensation; (2) constructively discharged him through actions that forced him to resign, entitling him to $100,000 in severance pay pursuant to the contract; and (3) owed him $7,500 for reimbursement of reasonable business expenses. The case was assigned to Judge Cedarbaum. Fogarty moved for summary judgment on his breach of contract claim, but the motion was denied on the ground that the contract was ambiguous. The case was then reassigned to Judge Sand.

At trial before Judge Sand, the bonus dispute focused on the meaning of the contract language naming Fogarty "President of our [Near North's] New York office," and making Fogarty's bonus dependent, in part, upon "your office" meeting specified "Cumulative Revenue Production" goals. These terms, drafted by Near North as part of its original offer, were not changed in its revised offer, nor were they ever questioned by Fogarty. Near North's position was that "President of our New York office" meant President only of the risk management practice within Near North's New York office and that, similarly, "Cumulative Revenue Production" of "your office" meant the cumulative revenue production of only the risk management practice within the New York office. Under this interpretation of the contract, Fogarty was not entitled to the bonus compensation he was seeking. It was Fogarty's position, on the other hand, that the disputed terms meant that he was President of the entire New York office and that the relevant cumulative revenue production was that of the New York office as a whole. Under this interpretation of the contract, Fogarty was entitled to the $300,000 bonus.[2]

As for his claim of $100,000 in severance pay, Fogarty's position at trial was that the circumstances surrounding his resignation constituted a constructive discharge and, thus, a "termination" under the contract, see note 1, for reasons other than "gross misconduct." In support of this claim, Fogarty testified that Near North reduced his responsibilities and authority, delayed bonuses that were eventually paid to him, placed an advertisement in a trade publication seeking a replacement for his position, would neither confirm nor deny his suspicion that he was to be replaced and withheld the $300,000 in bonus payments upon which his breach of contract claim was based. According to Fogarty, these actions forced him to resign. In addition, Fogarty argued that since his alleged constructive discharge was a "termination," pursuant to his contract he was entitled to a severance payment of six months of his annual salary. Since Fogarty's salary was $200,000 per year, the termination entitled him to $100,000. As for his business expense claim, Fogarty testified that he was never reimbursed for $7,500 spent entertaining clients.

The district court thoroughly instructed the jury on the law it was to apply in the course of its deliberations. The instruction at issue here concerned the manner in which the jury was to interpret the contract if it was unable to determine the parties' intent, as follows:

---

**2.** Fogarty computed the $300,000 claim as follows: Fogarty was a Near North employee for 15 months, and pursuant to his employment contract was entitled to a $200,000 bonus for each 12–month period in which the "New York office" met a specified cumulative revenue production goal. He was paid a $100,000 bonus during his first 12–month period, and claimed that he was owed an additional $100,000 bonus for those months because during that time the "New York office" (using Fogarty's definition of that term)

had met his first-year cumulative revenue production goal of $1,500,000. Fogarty also claimed that, because the "New York office" met his second-year cumulative revenue production goal of $2,500,000 prior to his resignation after 15 months, he was entitled to a $200,000 bonus for his second 12–month period with the company. The $300,000 bonus figure was thus a combination of the $100,000 that Fogarty claimed for his first 12–month period and the $200,000 that he claimed for the second 12–month period.

In the event that after considering the wording of the contract and the manifest conduct of the parties you are still unable to determine the parties' intent, then you may, as a last resort, take into consideration the fact that Near North drafted the relevant portions of the letter contract, and, under traditional principles of contract law, would be responsible for any ambiguities. Where efforts to fathom the parties' intent have proved fruitless, the contract may be construed adversely to the party that drafted it.

This instruction (the Instruction) was based on *contra proferentem,* a common law doctrine of contract interpretation that, in certain cases, allows a factfinder to construe ambiguous terms against the drafter.

After deliberating, the jury returned a verdict in favor of Fogarty, finding that (1) under the contract, Fogarty's bonus was to be based on the cumulative revenue earned by the entire New York office, rather than on the cumulative revenue earned by only the risk management line of business within the New York office; (2) Near North constructively discharged Fogarty by intentionally making working conditions so intolerable that he was forced to resign; and (3) Fogarty was entitled to reimbursement of his claimed business expenses. The district court entered judgment for Fogarty, awarding him $300,000 in bonus compensation, $100,000 in severance pay and $7,500 in business expenses, plus pre-judgment interest. Thereafter, Near North filed a motion, accompanied by a lengthy memorandum of law, for judgment as a matter of law on Fogarty's claim for constructive discharge, for a new trial on the breach of contract claim and for a stay of proceedings to enforce the judgment. In December 1997, the court denied Near North's motion in an unpublished opinion. This appeal followed.

## II. Analysis

On appeal, Near North argues that the Instruction was erroneous and prejudicial and asks that the judgment be reversed and the case remanded for a new trial. Near North claims in substance that the *contra proferentem* doctrine is typically confined to adhesion-type situations of unequal bargaining power in which one party has little or no say as to the terms and conditions of a contract, and that this was not the case here. In response, Fogarty argues that (1) Near North waived its challenge to the Instruction by failing to properly object to it in the district court; and (2) the Instruction was correct because recent case law has expanded the *contra proferentem* doctrine beyond contracts of adhesion and it may properly be applied to a contract term that has not been subject to negotiation and revision even if other terms have been bargained for or edited by the parties. As already indicated, we find Fogarty's first argument, to which we now turn, dispositive and do not reach the second.

The issue of waiver arose in the following context. At trial, Fogarty submitted a proposed supplemental jury instruction later marked as Court Exhibit 2. The proposed instruction stated, in relevant part:

In the event that you are unable to determine the parties' intent after considering the wording of the contract and the conduct of the parties, you may construe the contract adversely to Near North, the party which drafted the agreement and may have caused the misunderstanding, confusion or uncertainty as to its terms.

On the next to last day of trial, Judge Sand held a charge conference in the robing room. He stated that "the first order of business relate[d] to an instruction concerning an inference against the drafter of an ambiguous instrument." The judge noted that Near North had not submitted any proposed language, but had "called the court's attention to" *PaineWebber v. Bybyk,* 81 F.3d 1193 (2d Cir.1996) which, Near North argued, holds that ambiguous contract terms may not be construed against the drafter when the parties have engaged in contract negotiations and editing. Judge Sand stated that even though certain contract terms were changed at Fogarty's request, the disputed terms— "President of our New York office" and "Cumulative Revenue Production"—were not and were drafted solely by Near North.

Shortly thereafter, the following colloquy took place:

THE COURT: Have you had an opportunity to look at plaintiff's supplemental proposed jury instructions? Do you have any objection to that?

MR. NOVIKOFF [Near North's counsel]: I just want to take one more minute to review it.

THE COURT: This has them look to the inference only if they are unable to determine intent by other means.

MR. NOVIKOFF: I am not comfortable with, "You may construe the contract adversely." I think that is somewhat harsh.

MR. BURGER [Fogarty's counsel]: With all due respect, that is the purpose of the inference.

THE COURT [to Novikoff]: What language would you prefer in favor of the plaintiff's?

Near North's counsel offered no alternative language in response to the court's prompting. The court then stated that it would follow plaintiff's proposed instruction "in substance," but "[might] vary the language slightly." Discussion then turned to a different proposed instruction, after which the court stated that it would charge that instruction in addition to "the inference against drafter substantially as reflected in Court Exhibit 2." Counsel for Near North made no objection in response.

At a subsequent conference just before summations, counsel for Near North made clear that it was his understanding that the Instruction would be charged. Counsel stated:

I think given that your Honor is including a negative inference to the drafter of the complaint, it would be fair to put in the law as stated in my pretrial order, that the practical interpretations of either parties of the contract manifested by the conduct subsequent to the formation for any considerable length of time before it became subject to controversy is entitled to great, if not controlling, weight . . . .

Counsel also requested an instruction to the effect that when faced with two possible contract interpretations, a factfinder should not apply the broader interpretation absent a clear manifestation of intent. Counsel's reason for requesting this instruction was that

the court was "including the last rule of contract construction, that being, negative inference to the drafter." Once again, counsel made no objection to the Instruction. Finally, Near North did not object to the charge after Judge Sand delivered the Instruction.

█ Fed.R.Civ.P. 51 provides, in pertinent part, as follows: "No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating *distinctly* the matter objected to and the grounds of the objection." (emphasis supplied) A party who fails to object to a jury instruction at trial waives the right to make that instruction the basis for an appeal. See *Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir.1994); *Caruso v. Forslund,* 47 F.3d 27, 30–31 (2d Cir.1995). The purpose of the Rule is to allow the trial court an opportunity to cure any defects in the instructions before sending the jury to deliberate. See *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992) (citing 9 C. Wright & A. Miller, Federal Practice and Procedure § 2551 (1971), at 623). Accordingly, "[n]o particular formality is required of the objection so long as it is clear that the trial judge was informed of possible errors in the charge and was given an opportunity to correct them." Wright & Miller, § 2554 (1982), at 428.

██ We find that Near North failed to meet this standard. To preserve an objection, Rule 51 requires that a party object after the instruction is read to the jury, unless (as we have held) "a further objection to the charge as given, on a ground already thoroughly discussed, would have been futile." *Anderson,* 17 F.3d at 557. Near North does not claim that it objected to the *contra proferentem* charge after it was delivered; we therefore examine prior proceedings to determine whether Near North's prior objection was sufficiently distinct, and the court's rejection of it sufficiently categorical, that further objection was unnecessary. At the charge conference, Near North did call the court's attention to *PaineWebber,* the holding of which, Near North contended, prevented the application of the *contra proferentem* rule. However, the judge stated, in

effect, that *PaineWebber* was not applicable to the facts of the case before him, and then explicitly asked if Near North had *any* objection to plaintiff's proposed instruction. In response, counsel stated that the phrase "You may construe the contract adversely" was "somewhat harsh." But, when the court explicitly asked him for alternative language, counsel offered none. The vague response to the court's direct question as to a possible objection, combined with counsel's silence in response to the court's request for alternative language, simply fails to meet Rule 51's standard that a party "stat[e] *distinctly* the matter objected to and the grounds of the objection." *Caruso*, 47 F.3d at 31 (emphasis supplied). If Near North had meant to object to the Instruction, the easy and obvious response to the court's question as to what alternative language Near North would prefer should have substantially been (1) that the inference arises only if the plaintiff had no opportunity to propose a revision or a clarification of the contract terms at issue or (2) that the burden of proof charge was sound and should not be modified by a charge on *contra proferentem*. While we reiterate that no particular formality is required in order to properly lodge an objection at trial, the manner in which Near North claimed that it attempted to do so was clearly insufficient.

Counsel also failed to object or propose alternative language when the court twice stated that it would follow plaintiff's proposed instruction in substance. In addition, counsel's comments at the subsequent conference made clear that he had acquiesced, without objection, to the charging of the Instruction.[3]

Near North argues that it had already made its position clear and, as a result, any further objection during pre-charge proceedings would have been futile. We disagree. The cases cited by Near North that excuse a failure to object to an instruction because it would be futile to do so are easily distinguishable. See *Thornley v. Penton Publ'g,*

104 F.3d 26, 30 (2d Cir.1997) (finding no waiver of challenge to district court's refusal to give a requested instruction where appellant suggested the instruction and "argued its position to the district judge, who rejected it"); *Anderson*, 17 F.3d at 557 (finding no waiver where the instruction was "already thoroughly discussed," and "at the outset of a short conference ... the district court expressly stated 'that if this is something that we raised the other day, you don't need to repeat yourself' "); *Keen v. Overseas Tankship Corp.*, 194 F.2d 515, 519 (2d Cir.1952) (finding no waiver even though plaintiff had not formally objected to the instruction because plaintiff "had made his point *clearly* ... [and] the judge had overruled him" (emphasis supplied)). In all of these cases, counsels' points were clear and unambiguous. In other words, the trial court had been clearly apprised of the possibility of error and had disagreed, or had been given an opportunity to correct the error and had declined to do so. The record in this case, however, is different. As previously discussed, Near North's position with respect to the Instruction was far from clear during the conference, and the district judge did not indicate that he had "overruled" any such position. Indeed, the court explicitly asked for both an objection and alternative language, and received, respectively, a vague answer and silence in response. Accordingly, we cannot say that Near North has shown that further objection would have been futile.

■ Of course, it is arguable that if the charge were plain error we could disregard Near North's failure to object and consider its argument on the merits. See *Anderson*, 17 F.3d at 556. However, the underlying legal question in this case is whether, as a matter of New York law, *contra proferentem* is applicable where (1) the parties to the contract are a medium-sized employer and a high-level managerial employee unrepresented by counsel and lacking expertise in personnel matters; (2) the parties engage in

---

**3.** Moreover, we find it significant that Near North's trial counsel never raised the Instruction in the voluminous papers accompanying its post-trial motion for judgment as a matter of law or for a new trial. (Near North has retained different

ent counsel to bring this appeal). Even though Fogarty made this point in his brief on appeal, Near North failed to respond to it in its reply brief.

negotiation and editing of certain contract terms; i.e., the contract is not one of adhesion; and (3) the ambiguous terms that must be construed were drafted by the employer and are not among those that were the subject of the parties' negotiations and/or editing. The answer to this question is sufficiently unclear that, had Near North not waived its claim, we would have seriously considered certifying the question to the New York Court of Appeals. Thus, if there was any error on the part of the district court (as to which we express no view) it was not plain.

Finally, Near North argues in its reply brief that Fed.R.Civ.P. 51 must be construed together with Fed.R.Civ.P. 46, which states that "[f]ormal exceptions to rulings or orders of the court are unnecessary ... [and] it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which the party desires the court to take or the party's objection to the action of the court and the grounds therefor...." See, e.g., *Wright v. Farm Journal, Inc.*, 158 F.2d 976, 978 (2d Cir.1947). Since we have already noted that an objection requires no particular formality, and have concluded that Near North failed to make its objection sufficiently known to the district court even under this lenient standard, this point does not change our analysis.

### III. Conclusion

We conclude that Near North waived its challenge to the Instruction, and we affirm the judgment of the district court.